UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

OCTAVIOUS FAYTON,

Defendant.

Case No. 1:23-cr-00001 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Defendant Octavious Fayton ("Defendant") is charged with two counts of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g), after these items were recovered from his vehicle by New York City Police Department ("NYPD") officers on August 14, 2022.  *See* ECF No. 6 ("Indictment").  On April 24, 2023, Defendant moved to suppress the firearm and ammunition on the grounds that they are "fruits of the poisonous tree," having been recovered after a traffic stop that allegedly violated the Fourth Amendment.  ECF No. 9 ("Br.").  The Government filed its opposition on May 26, 2023.  ECF No. 14 ("Opp.").  Defendant filed his reply brief on July 7, 2023.  ECF No. 17 ("Reply").  On September 26, 2023, the Court held an evidentiary hearing, where two officers testified.

For the reasons set forth below, the motion to suppress is DENIED.

**RELEVANT FACTS[1]**

Because the record in this case includes video footage from the body cameras of four NYPD officers involved in the incident, many of the facts are not in dispute.  *See* Gov. Ex. 1

---

[1] For all factual determinations in dispute, the Court must consider whether the Government has proved such a fact by a preponderance of the evidence.  *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

(Officer Jonathan Lluberes body-worn camera or "Ex. 1"), Gov. Ex. 2 (Officer Argenis Paulino body-worn camera or "Ex. 2"); *see also* ECF No. 9 and corresponding attachments.[2]  In addition, Officers Lluberes and Paulino testified at the evidentiary hearing held on September 26, 2023.

On August 14, 2022, at a little after 6:00 p.m., uniformed NYPD Officers Paulino and Lluberes were in an unmarked NYPD patrol car near White Plains Road and East Gun Hill Road in the Bronx.  *See* ECF No. 1 ("Compl.") ¶ 4(a); Ex. 2 at 1:00-1:31.  The officers observed a dark BMW sedan that had tinted windows, no front license plate, and what appeared to be a defective headlight.  Compl. ¶ 4(b); *see* Hearing Tr. ("Tr.") at 16:8-10; 17:4-7; 18:1-3.  They maneuvered to get behind his car and follow him.  *See* Tr. at 19:2-9.  The car proceeded northbound on White Plains Road at a speed that both officers believed was over the speed limit.  *Id.* at 19:14-20; 119:25-120:1.  The officers followed the car for about ten blocks (exceeding the speed limit themselves to try to keep up with the car), without activating their lights or sirens, and were unable to "close the gap" between their car and Defendant's vehicle.  *Id.* at 21:23-22:1; 55:24-56:3.  Defendant took a "sharp" left turn onto 220th Street, and the officers followed.  *Id.* at 20:10-21:9.  When Defendant made this sharp left turn, there were pedestrians in the area at the crossing.  *Id.* at 120:2-14; *see* Gov. Ex. 4 (New York State Grand Jury Testimony of Officer Lluberes) at CML9:18-CML10:4.  He took another "sharp" left turn onto Carpenter Ave, at which point the officers saw Defendant nearly collide with a vehicle backing out of a parking space.  Tr. at 22:2-19; 121:12-16.  The officers continued to follow him through another left turn onto 219th Street, followed by a right turn onto Olinville Avenue, all while he was driving over the speed limit.  *Id.* at 22:20-23:9.  On Olinville Avenue, at least one car was double-parked, and

---

[2] While all videos were submitted with the motion to suppress, two of the videos were introduced as exhibits as Government Exhibits 1 and 2 during the evidentiary hearing.  Therefore, the Court will rely primarily on those videos.

Defendant squeezed past those cars at a high rate of speed. *Id.* at 23:10-23. At this point, according to Officer Lluberes, the officers turned on their lights and sirens. *Id.* at 24:2-9. Defendant turned right onto 216th Street and pulled over. *Id.* at 24:16-25. At this time, the officers testified that they intended to arrest Defendant, and therefore called for back-up using the terms "92" and "under." *Id.* at 25:9-15; 26:2-11.

After pulling over Defendant, Officer Paulino turned on his body-worn camera, exited the vehicle, and approached Defendant's vehicle. Defendant provided his license and registration to Officer Paulino, and turned off the vehicle. Ex. 2 at 1:25-1:30. Officer Lluberes also activated his body worn camera and approached the passenger-side of the vehicle. Defendant informed the officers that he was coming from a cookout down the block, where he dropped off his partner and child, and was en route to a friend's house. *Id.* at 1:30-1:54. Upon request, Defendant also provided Officer Paulino with his current address. *Id.* at 1:55-2:00. Officer Paulino informed Defendant that their interaction was being recorded, and that he was pulled over for tinted windows and because a headlight was out. *Id.* at 2:01-2:17. Officer Paulino did not tell Defendant that he was going to be arrested, or on what basis, because there were only two officers present, and he did not want to inform the Defendant until back-up arrived. Tr. at 128:6-20. Officer Paulino asked Defendant if he had a medical note for the excessive tints, and Defendant explained that he did not, but he had just received a ticket for the tinted windows. Ex. 2 at 2:17-2:23. Officer Paulino asked Defendant to exit the vehicle. *Id.* at 2:23-2:26. Defendant asked why he needed to step out of the car. *Id.* at 2:26-2:27. Officer Paulino said he wanted to have a conversation at the back of the car, and Defendant responded, "Tints means I step out the car?" *Id.* at 2:33-2:35. Officer Paulino explained that he could ask Defendant to step out of the car, or could take him back to "command" – the police station or precinct – for

3

any infraction.  *Id.* at 2:35-2:46.  Defendant said he understood, but that "he didn't do anything," and did not feel he should step out of the car; he said he thought he should get a ticket for the tinted windows, like he had before.  *See id.* at 2:46-3:04.  Officer Paulino repeated his command to step out of the car, and Defendant ultimately complied with the officer's orders and exited the vehicle, with his arms and hands up and visible to the officers.  *Id.* at 3:12-3:29.  Officer Paulino asked "why are you going like this" – presumably questioning why Defendant's hands were raised – and Defendant reiterated that he did not see a reason to be taken out of the car for his traffic violations.  *Id.* at 3:29-3:56.  During this interaction, both the officers and Defendant stepped towards the rear of the vehicle.  *Id.*  Defendant continued to explain that he did not understand why he needed to exit the vehicle because he had just left a cookout and knew that he needed to remove the tint from the windows.  *Id.*  Defendant further explained that the car was his partner's, and that he felt threatened by the officers stopping him and asking him to exit the car.  *Id.* at 3:55-4:15.  Officer Paulino told Defendant that he had been pulled over for traffic infractions, and that Defendant's nervousness in the officers' presence made the officers nervous.  *Id.* at 4:15-4:48.[3]  Defendant responded with understanding, and Officer Paulino further explained that they would have the conversation, "and that's it, fair enough?"  *Id.* at 4:49-4:57.  Defendant agreed.  *Id.* at 4:57.

Roughly four minutes after the initial stop, Officer Paulino began (but did not finish) running Defendant's license, asked if he had any unpaid summonses, and asked if there was anything in the car that the officers should be worried about.  *Id.* at 4:57-5:10.  Defendant indicated that his license was "fine," that he had no unpaid summonses, and that he was sure

---

[3] Defendant was visibly sweating; the Government attributed this to his nervousness while defense counsel noted that it was August and hot outside.  Tr. at 33, 232.  Resolution of this factual issue is not necessary for the Court's ultimate assessment here.

there was nothing in the vehicle that the officers should worry about.  *Id.*  Officer Paulino then said, "My partner's going to go take a look, just be honest with me."  *Id.* at 5:12-5:14.  Defendant responded: "I really can't give you consent to search the vehicle," and Officer Paulino stated that he was not "asking for consent," but "telling" Defendant "as a courtesy."  *Id.* at 5:20-5:31. Simultaneously, Officer Lluberes told Defendant – who appeared to be trying to call someone on his cellphone – that he did not want Defendant to be on his phone during a "lawful car stop."  *Id.* Officer Paulino told Defendant that he could call his partner back when they were through.  *Id.* at 5:37-5:41.  He continued, "the more difficult you make this –" to which Defendant said, "I'm not trying to make it difficult," and again reiterated that, when he had previously been stopped by officers, he had been issued a ticket and let go.  *Id.* at 5:45-5:57.  Officer Paulino stated in response that Defendant had been difficult because he did not follow his instructions to step out of the car and to hang up his phone.  *Id.* at 5:57-6:07.  Defendant replied that he had followed instructions, and that he felt like he was being harassed, which Officer Paulino refuted; he reiterated that he had told Defendant why he was pulled over, to which Defendant said he understood.  *Id.* at 6:07-6:19.

Officer Lluberes testified that around this time, he was trying to determine the whereabouts of the officers' back-up in order to effectuate the arrest.  Tr. at 32:1-12.  In the video footage, after about a minute and a half, Officer Paulino asked Defendant whose vehicle he was driving.  Ex. 2 at 7:44.  Defendant answered that it was his wife's car.  *Id.*  Officer Paulino again asked, "Anything in the vehicle?  You've got quite a few arrests bro."  *Id.* at 7:57-8:02. Defendant said, "nothing in the vehicle, sir," to which Officer Paulino responded, "fair enough." *Id.* at 8:02-8:04.  Officer Paulino then asked Officer Lluberes, "do you have the summons?" and Officer Lluberes made a gesture indicating he did not, saying "Rijo's on his way."  *Id.* at 8:05-

8:07.  Officer Paulino's request to Officer Lluberes for a summons was essentially code for asking when back-up would arrive.  Tr. at 131:4-16.  While Officer Lluberes had summonses with him at the time, his response to Officer Paulino was intended to indicate that back-up – Officer Rijo – was on his way to the scene.  *Id.* at 34:10-23; 35:10-12, 18-21.  Even though Officer Paulino also had summonses with him, he told Defendant that he did not "have anything on" him, and so he was going to take Defendant back to command.  Ex. 2 at 8:07-8:25. Defendant clearly indicated that he did not want to go back to the precinct, saying "that's not right . . . please just write me a ticket so I can get my kid."  *Id.* at 8:24-8:34.  The officers and Defendant had a back and forth with the officers saying that the trip would be quick and Officer Paulino then handcuffed Defendant.  *Id.* at 8:34-8:48.  Defendant, while being handcuffed, expressed dismay at being arrested for a traffic violation, rather than being handed a summons on the street. *Id.* at 8:48-9:39.  Officer Paulino told him, "We'll treat you like a gentleman, you've been one."  *Id.* at 9:07-9:11; Tr. at 185:24-186:2.  As the officers escorted Defendant into a separate car, driven by two other NYPD officers, Officer Paulino told Defendant, "you have multiple VTL [Vehicle and Traffic Law] infractions" and "I'm going to arrest you, alright?" Ex. 2 at 8:48-9:39.  Defendant continually expressed frustration at his arrest, calling it "crazy," but he complied with the commands.  *Id.* at 9:40-10:10.  The officers testified that they were not transparent with Defendant during their interactions with Defendant because back-up had not arrived yet, they needed additional people to arrest Defendant and bring his vehicle back to the station, and they wanted to keep things calm while they effectuated the arrest of Defendant.  *See* Tr. at 34:10-23; 35:1-12, 18-21; 128:6-10; 131:4-16.  The officers did not search the car on the scene.

The officers also needed authorization from a Sergeant for the arrest.  *Id.* at 36:7-16; 132:25-133:2.  Therefore, while Defendant was in the patrol car, the officers awaited the arrival of Sergeant Butt.  *See* Ex. 2 at 10:10-18:11.  About eight minutes after Defendant was placed in the car, Sergeant Butt arrived, and Officer Paulino informed the Sergeant that Defendant "has a couple of summons, tints, no front plate, headlight and he was driving with like three infractions" and that they were bringing him to command.  *Id.* at 18:20-18:39.  Sergeant Butt responded "oh, so you're gonna do reckless driving?" and Officer Paulino said, "correct."  *Id.* at 18:37-18:38.  Sergeant Butt said that it was fine for the officers to bring Defendant back to command, and confirmed that someone would drive the car back to the precinct as well.  *See id.* at 18:38-18:49.  Officer Lluberes drove Defendant's car back to the precinct.  *See* Ex. 1 at 19:11.  The back-up officers drove Defendant back to the precinct.

At the station, Defendant was processed, his personal belongings were collected, and he was placed in a holding cell.  *See* Ex. 1 at 28:07-30:15.  Officer Paulino told Defendant that it would be "an hour tops."  *Id.* at 28:11-28:30.  While Defendant was in the holding cell, the officers conducted an inventory search of his vehicle.  During that search, the officers discovered a firearm and box of ammunition in the vehicle.

## DISCUSSION

Defendant moves to suppress the firearm and ammunition on the grounds that the traffic stop was unreasonably prolonged in violation of the Fourth Amendment under *Rodriguez v. United States*, 575 U.S. 348 (2015) and its progeny, such that discovery of the firearm and ammunition during the subsequent inventory search are fruits of the poisonous tree.  *See* Br.  The Government argues that this case should not be analyzed under *Rodriguez* because the officers found the firearm and ammunition during a lawful inventory search after an arrest based on

probable cause, not during a traffic stop based on reasonable suspicion.  *See* Opp. at 1.

According to the Government, the officers had probable cause to arrest – and did in fact arrest –

Defendant on at least two independent grounds: reckless driving, and certain vehicle and traffic

violations.  *Id.*  Therefore, the inventory search of the car attendant to that arrest, resulting in the

recovery of the gun and ammunition, was proper.  The Court will address the parties' arguments

in turn.

## I.     Application of *Rodriguez*

As an initial matter, Defendant's primary argument is that this case involves a traffic

stop, and therefore *Rodriguez* and its progeny govern the reasonableness of the stop and the

subsequent search.  The Government argues this case involves a lawful arrest and inventory

search, and thus *Rodriguez* is irrelevant.  In light of this dispute, a review of two Supreme Court

cases is helpful to understand the contours of the parties' disagreement.

More than twenty years ago, in *Atwater v. City of Lago Vista,* the Supreme Court

considered the question of whether "the Fourth Amendment forbids a warrantless arrest for a

minor criminal offense," including traffic violations and other offenses punishable by merely a

fine.  532 U.S. 318, 323 (2001).  The Supreme Court held that it did not.  *Id.*  There, the plaintiff

had been driving in Texas with two small children, and no one was wearing a seatbelt.  *Id.*

at 323-24.  An officer pulled the vehicle over, and after a back and forth, handcuffed the plaintiff

and put her in the back of the patrol car.  *Id.* at 324.  She was processed, her personal items were

collected, and she was put in a holding cell for roughly an hour.  *Id.*  After she was released on

bond, she pleaded no contest to misdemeanor seatbelt offenses, and the other charges – including

driving without a license – were dismissed.  *Id.*  The plaintiff subsequently filed suit pursuant to

42 U.S.C. § 1983 against the City of Lago Vista and chief of police, arguing that she had been

subject to a false arrest.  *Id.* at 325.  The district court concluded that there had been no violation of the Fourth Amendment because the plaintiff admitted that she had violated some traffic laws, but the Fifth Circuit disagreed because the offenses were minor.  *Id.*  Following *en banc* review at the Fifth Circuit, the Supreme Court took up the issue, and after considering the common law and history of the Fourth Amendment, it held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Id.* at 354.  Specifically, the Supreme Court found that the plaintiff's arrest in that case, which encompassed being "handcuffed, placed in a squad car, and taken to the local police station," where officers removed her personal belongings and held her in a cell for an hour, did not violate the Fourth Amendment because the officers had probable cause to arrest her for violations of the traffic laws.  *See id.* at 354-55.

Justice O'Connor, writing for Justices Stevens, Ginsburg, and Breyer, dissented from the holding.  *See id.* at 360 (O'Connor, J., dissenting).  The dissent specifically took issue with the probable consequences of the majority's ruling.  *See id.* at 360-66.  The dissenters warned that, under the rule established in the majority opinion, a police officer with probable cause that an individual had committed a fine-only misdemeanor could now "stop the car, arrest the driver, . . . search the driver, . . . search the entire passenger compartment of the car including any purse or package inside, . . . and impound the car and inventory all of its contents."  *Id.* at 372 (internal citations omitted).  The bright-line rule propounded in *Atwater*, the dissenters feared, had "grave potential for abuse," particularly in light of the then-recent (and certainly ongoing) debates "over racial profiling," and the concern that traffic stops were already being used as "an excuse" to stop and harass minorities.  *Id.*  Nevertheless, since *Atwater*, the law is clear that police officers

can arrest for misdemeanor criminal offenses, including traffic violations, so long as they are committed in the officers' presence. *See Kennedy v. City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014) (quoting *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994)); *see also Guillen v. City of New York*, 625 F. Supp. 3d 139, 151 (S.D.N.Y. 2022) ("[A] traffic infraction is deemed an offense that can give rise to probable cause for arrest." (internal citation omitted)).

About fifteen years later, in *Rodriguez*, the Supreme Court evaluated the constitutionality of a traffic stop where a drug-sniffing dog was eventually brought to the scene. In that case, the defendant was pulled over after veering over to the shoulder of a highway for "one or two seconds" in violation of Nebraska law. 575 U.S. at 351. The officer took the defendant's license, registration, and proof of insurance, asked a few questions about the defendant and passenger's origin and destination, completed a records check on the passenger, and wrote the defendant a warning ticket (but did not arrest him). *Id.* at 351-52. After the ticket had been issued, the officer did not tell the defendant that he could leave; instead, the officer asked if he could walk his dog around the car. *Id.* at 352. The defendant said no, but the officer still instructed him to exit the car and wait for a second officer to arrive. *Id.* When the deputy sheriff arrived, the officer retrieved his dog, who indicated the presence of drugs. *Id.* The officers searched the car and located a bag of methamphetamine; they then arrested the defendant. *Id.* The district court denied the defendant's motion to suppress the drugs, concluding that because the dog sniff added only 7 to 10 minutes to the stop, it was a "de minimis" privacy intrusion. *Id.* at 353. The Eighth Circuit affirmed. *Id.*

But the Supreme Court reversed, holding that when an officer conducts a traffic stop, the stop may "last no longer than is necessary to effectuate" the purpose of addressing the infraction. *Id.* at 354 (internal quotation marks and citation omitted). Thus, the "[a]uthority for the seizure

. . . ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id.*  The tasks that are typically part of the stop include "determining whether to issue a traffic ticket, . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355.  Thus, the Court held, "[a] seizure justified only by a police-observed traffic violation" becomes "unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation."  *Id.* at 350 (internal quotation marks omitted).

Justice Thomas's dissent in *Rodriguez* – in which Justice Alito and Justice Kennedy joined in relevant part – criticized the unpredictability of the majority's holding in *Rodriguez*. Specifically, the dissent noted that had the officer "arrested, handcuffed, and taken Rodriguez to the police station for his traffic violation, he would have complied with the Fourth Amendment" under *Atwater*, but "because he made Rodriguez wait for seven or eight extra minutes until a dog arrived [which later found drugs leading to an arrest], he evidently committed a constitutional violation."  *Rodriguez,* 575 U.S. at 367 (Thomas, J., dissenting).

Here, the former scenario is present, and the parties' arguments illuminate the tension between *Atwater* and *Rodriguez*.  On the one hand, Defendant contends that *Rodriguez* applies because the officer impermissibly elongated the traffic stop when they asked Defendant to get out of the car and have a conversation, repeatedly asked if there was "[a]nything in the vehicle," "prob[ed]" to gain consent to search the car, and further "unconstitutionally prolonged the stop by taking Mr. Fayton back to the precinct" instead of just giving him a ticket or a summons at the scene.  Br. at 3-4, 7-8, 13.  To Defendant, the primary inquiry for the Court is the reasonableness of the officers' conduct, and he argues that it was unreasonable for the officers to arrest

Defendant for a traffic violation after he had provided them with his license and registration, and they had checked for outstanding warrants.  *See* Br. at 10.

The Government, on the other hand, argues that Defendant was lawfully arrested for traffic violations based on undisputed probable cause, so the later resulting inventory search that unearthed the firearm and ammunition was reasonable under the Fourth Amendment.  *See* Opp. at 16-17.  The Government asserts that *Rodriguez* is inapplicable because the officers there issued the defendant a warning ticket for his traffic violation (and did not arrest him for that violation), and *then* prolonged the traffic stop by conducting an unreasonable search (through a drug-sniffing dog), which led to the recovery of drugs and his eventual arrest – a "clear deviation from the facts presented here." *Id.* at 20.

Neither party has pointed the Court to a case with facts like those presented here. Defendant directs the Court to cases that, under *Rodriguez*, have concluded that a traffic stop was unreasonably prolonged, but they are distinguishable from the case at hand.  *See* Br. at 8-9.  First, in *United States v. Gomez*, the defendant was stopped after officers witnessed three traffic violations, including driving through a red light, speeding, and changing lanes without using a signal.  877 F.3d 76, 80-81 (2d Cir. 2017).  The officers' questioning during the stop, however, did not relate to checking the driver's license, determining whether there were any outstanding warrants, or inspecting proof of insurance, but instead primarily involved inquiries about heroin trafficking.  *See id.* at 91.  Ultimately, the officers searched the trunk – with the consent of the defendant – and found heroin.  *Id.*  Even though the stop was only five minutes, the Second Circuit concluded that "an officer may not consume much of the time justified by the stop with inquiries about offenses unrelated to the reasons for the stop."  *Id.* at 92.  While the Second Circuit ultimately affirmed the district court's order denying the motion to suppress based on the

good faith exception to the exclusionary rule given earlier contrary precedent, it found that
*Rodriguez* now required the conclusion that the traffic stop violated the Fourth Amendment. *Id.*
at 93-94, 96.

Next, in *United States v. Milton*, the court suppressed a firearm recovered during a traffic
stop because the traffic stop had been unreasonably prolonged in violation of the Fourth
Amendment. 621 F. Supp. 3d 421, 432 (S.D.N.Y. 2022). There, the defendant was a passenger
in a vehicle, which was pulled over after officers observed both heavily tinted windows on the
car, and the car "pull out and cross two lanes of traffic without signaling." *Id.* at 423-24. During
the traffic stop, the officers spoke with both the driver and the defendant passenger, but did not
issue a summons or tickets for any of the traffic violations; instead, they asked the two men
several questions, including what they were last arrested for, and whether they would consent to
the search of the car. *Id.* at 424-25. During that conversation, when the defendant passenger was
asked to exit the vehicle, he made a series of movements which the officers understood were
"designed to conceal his right side" while reaching into his pocket. *Id.* at 425. On those
grounds, they searched him, and found a weapon. *Id.*

The *Milton* court concluded that the stop was unreasonably prolonged because, even
though the stop lasted only five or six minutes, the "the officers' 'investigative inquiries
unrelated to the traffic violations prolong[ed] – i.e., add[ed] time to – the stop.'" *Id.* at 430
(alterations in original) (quoting *Gomez*, 877 F.3d at 91). In particular, the court concluded that,
after "the officers had completed their checks of both the driver and [the defendant passenger]
and confirmed that there were no outstanding warrants for either[,] . . . all of the 'ordinary
inquiries incident to the traffic stop' had been completed, and the only tasks left for the officers
to perform were issuing a summons, ticket, or warning for the motor vehicle violations and

letting [the defendant] and the driver go." *Id.* at 430-31 (quoting *Rodriguez*, 575 U.S. at 355). But instead, they asked questions about the two men's prior arrests, whether there were any fake identifications or weapons in the car, and whether they would consent to a search of the car. *Id.* at 431. Because these questions were "not pertinent" to the mission of the stop – addressing traffic violations – they unreasonably prolonged the stop. *See id.* The court concluded, "[i]n short, because the officers' investigative inquiries unrelated to motor vehicle violations prolonged the traffic stop in this case, [the defendant passenger's] continued detention and all that followed from it, including the frisk and seizure of the firearm, violated the Fourth Amendment." *Id.* at 432.

The facts here differ in key ways from this line of cases, guiding the Court to the conclusion that *Rodriguez* ultimately does not govern this case. To be sure, as in *Rodriguez*, *Gomez*, and *Milton*, police officers observed the driver commit several traffic violations. Also, like in those cases, the officers here may have asked some unrelated questions and Defendant argues that he was detained longer than was necessary to conduct inquiries incident to a traffic stop.[4] But unlike in *Rodriguez*, *Gomez*, and *Milton*, Defendant was *arrested* based on probable cause for various traffic violations. In addition, the arrest took place *before* the inventory search that was later conducted at the station, resulting in the discovery of a firearm and ammunition. *See United States v. Diaz*, 854 F.3d 197, 209 n.16 (2d Cir. 2017) ("We do not address whether

---

[4] The Court notes that the officers asked Defendant questions that, as described in *Milton*, would appear unrelated to the mission of the traffic stop, such as whether he would consent to a search of the vehicle, and "[a]nything in the vehicle? You've got quite a few arrests bro." Ex. A at 7:57–8:02. Because the Court concludes that the relevant inquiry here is whether there was an arrest supported by probable cause, resulting in a later permissible inventory search, it does not address whether these questions "unreasonably prolonged" the stop under *Rodriguez*.

the search was a lawful *Terry* search because we conclude that the search was a lawful search incident to an arrest.").

Defendant was indisputably arrested.  He was not free to leave and was placed in handcuffs, which "are generally recognized as a hallmark of a formal arrest." *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (collecting cases).  Moreover, as the officers escorted Defendant to the patrol car after placing him in handcuffs, Officer Paulino told Defendant, "I'm going to arrest you, alright?"  Ex. A at 8:48-9:39.  As the *Rodriguez* dissenters observed, an arrest is not subject to the same constitutional limitations as a traffic stop.  *See* 575 U.S. at 367 (Thomas, J., dissenting).  After a warrantless arrest, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." *Bryant v. City of New York*, 404 F.3d 128, 138 (2d Cir. 2005); *see also Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975) ("Under this practical compromise, a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest."); *id.* at 125 ("[A state] must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest."); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) ("Taking into account the competing interests articulated in *Gerstein*, we believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*.").  If the Court were to consider the time spent conducting the arrest for a traffic violation, obtaining authorization for the arrest, bringing the arrestee to the precinct, and processing the arrestee at the precinct as part of an allegedly elongated traffic stop under *Rodriguez*, as Defendant urges,

*Atwater* and its progeny would have no significance.  All arrests conducted in connection with a traffic stop would then require an analysis under *Rodriguez* to determine if the length of time to conduct the arrest and process the arrestee was unreasonably prolonged.  No court has extended *Rodriguez* into this context, and the Court will not do so now.

Put simply, the parties have not identified any case that has applied *Rodriguez* to evaluate the propriety of, and length of time related to, arresting a defendant for traffic violations otherwise permitted in *Atwater*.  At oral argument following the evidentiary hearing, Defendant could point to no such case and argued instead that "the spirit of *Rodriguez*" suggests that "arrest[ing] someone for a traffic violation, while lawful, may be beyond the scope of reasonable."  Tr. at 225.  But absent authority supporting Defendant's view of this case, *Atwater* controls, which permits an arrest for traffic violations.  *See supra* at 8-10.  Thus, the Court concludes that the *Rodriguez* line of cases does not apply here because Defendant was arrested, and the firearm and ammunition were discovered as part of an inventory search subsequent to that arrest.

## II.    Probable Cause

However, the Court must still consider whether probable cause supported Defendant's arrest.  The Government contends that the officers had probable cause to arrest Defendant for both reckless driving and the traffic infractions.  *See* Opp. at 1.  Defendant contends that the officers did not have probable cause to arrest for reckless driving, and under the circumstances, it was unreasonable to arrest Defendant for traffic violations.  *See* Br. at 9-11.

### A.  Reckless Driving

The Government argues that the officers initially observed that Defendant's vehicle had several vehicle infractions such as tinted windows, the lack of a front license plate, and a broken

headlight.  Opp. at 2.  According to the Government, when the officers began following Defendant in order to address the infractions, Defendant drove recklessly and erratically to avoid being stopped, and thereafter, the officers stopped him and arrested him for reckless driving.  *Id.* at 2-3.  Defendant asserts that the Court should not credit the testimony of the officers regarding what they observed about Defendant's driving, but even if credited, it is not enough to constitute reckless driving.

The Court credits the testimony of the police officers that they observed Defendant exceeding the speed limit as they followed him, given that the officers had to exceed the speed limit while following him.  *See United States v. Williams*, No. 15-cr-00499 (SJ), 2016 WL 4542352, at *2 (E.D.N.Y. Aug. 31, 2016) (concluding that probable cause existed for both speeding and reckless driving where the officers had to "speed up past the speed limit in order to stay in place with [the defendant's] vehicle"), *aff'd*, 930 F.3d 44 (2d Cir. 2019).  While Defendant points to some discrepancies in the record, based on the overall record presented and the Court's observations of the credibility of the officers, the Court credits the testimony of the officers that while Defendant was speeding, he also made at least one sharp turn off of White Plains Road, where pedestrians were present, made another sharp turn that resulted in a near-collision with another vehicle, and while speeding, squeezed through double parked cars on a one-way street.  *See* Tr. at 22:2-23:23; 24:2-9; 120:2-14; 121:12-16; Gov. Ex. 4 (New York State Grand Jury Testimony of Officer Lluberes) at CML9:18-CML10:4.  On these facts, whether the officers had probable cause to arrest Defendant for reckless driving is a fairly close question.

Reckless driving constitutes "driving or using any motor vehicle . . . in a manner which unreasonably interferes with the free and proper use of the public highway, or unreasonably endangers users of the public highway."  New York Vehicle and Traffic Law ("VTL") § 1212.

"Determining whether conduct rises to the level of unreasonable interference or endangerment such that it constitutes the requisite recklessness involves the presence of additional aggravating acts or circumstances beyond a single violation of a rule of the road." *People v. Goldblatt*, 950 N.Y.S.2d 210, 213 (3d Dep't 2012).  For example, speeding alone is not sufficient to constitute reckless driving.  *See People v. Lamphear*, 316 N.Y.S.2d 113, 116 (3d Dep't 1970).  However, "speed plus crossing into the passing lane when the view of oncoming traffic is not clear is sufficient." *Goldblatt*, 950 N.Y.S.2d at 213.  Here, Defendant was not only speeding; he also made at least one fast turn near pedestrians, was speeding quickly between closely parked cars, and was driving in such a way as to cause a near collision with another car.  These facts, together, are at least minimally sufficient to establish probable cause to arrest Defendant for "unreasonably interfer[ing] with the free and proper use of the public highway, or unreasonably endanger[ing] users of the public highway."  VTL § 1212; *see People v. Warren*, 75 N.Y.S.3d 611, 614 (3d Dep't 2018) (finding probable cause for reckless driving where the officer saw the defendant speeding, swerving to avoid a collision, and failing to signal); *United States v. Bethea*, 191 F. Supp. 3d 249, 256-57 (E.D.N.Y. 2016) (finding probable cause for reckless driving where the officers observed the defendant "driving erratically and at a high rate of speed through a residential neighborhood at night"); *Williams*, 2016 WL 4542352, at *2 (finding probable cause for reckless driving where the officers observed the defendant speeding "and weaving in and out of traffic without signaling"); *People v. Malave*, 798 N.Y.S.2d 712 (Sup. Ct. 2004) (finding probable cause for reckless driving where the officer observed the defendant speeding, weaving in and out of traffic, and driving through red lights); *Blackmon v. McKimmie*, No. 18-cv-0650V, 2019 WL 7195320, at *8 (W.D.N.Y. Nov. 7, 2019) (finding probable cause for reckless driving

where the officer observed the defendant almost hit him), *report and recommendation adopted*, No. 18-cv-00650, 2019 WL 7194524 (W.D.N.Y. Dec. 26, 2019).

That the officers did not tell Defendant at the start of the traffic stop that he was being arrested and taken back to the station for reckless driving does not change the outcome of this motion.  Defendant admits that, "[t]o be sure, the officers were not obliged to tell Mr. Fayton the basis for the arrest."  Reply at 3; *see also Devenpeck v. Alford*, 543 U.S. 146, 154 (2004) ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required."); *United States v. Samms*, No. 3:22-cr-00130 (SVN), 2023 WL 386819, at * 4 (D. Conn. Jan. 25, 2023) (denying motion to suppress evidence seized after a stop for tinted windows, noting "the fact that the officers did not immediately tell him why he was being asked to exit the vehicle . . . is not material to the validity of the stop or search").

### B.  Traffic Violations

Even if the officers did not have probable cause to arrest Defendant for reckless driving, they had probable cause to arrest him for the three VTL infractions, regardless of whether they intended to arrest him for those infractions.  *See Zellner v. Summerlin*, 494 F. 3d 344, 369 (2d Cir. 2007) (noting that the "officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause'" (quoting *Devenpeck*, 543 U.S. at 153)).  Defendant does not contest that the officers had probable cause to stop him for traffic violations, including for excessively tinted windows, in violation of VTL § 375.12-a(a), for a broken headlight, in violation of VTL § 375.2(a)(1), and for a missing front license plate, in violation of VTL § 402(1)(a).  *See* Reply at 5.  An officer has probable cause to arrest an individual for even a minor traffic violation that is committed in the officer's presence.  *See*

*Atwater*, 532 U.S. at 354; N.Y. Crim. Proc. Law ("NYCPL") § 140.10(2) (permitting arrests for "petty offenses" committed in an officer's presence); *id*. § 1.20(39) (defining VTL §§ 375.13 and 0402.01A (unlawful use of tinted windows, unlawful absence of license plate, and other traffic violation as petty offenses)).  The traffic infractions (as well as reckless driving) were also listed as offenses in the Complaint Report.  *See* Gov. Ex. 5.

Defendant nevertheless argues that, because NYPD policy is to issue a summons for traffic violations at the scene, it was unreasonable to arrest Defendant and thereafter conduct the inventory search of the car.  *See* Br. at 10; Reply at 4-5.  While it may not be the NYPD's general approach to arrest a driver and take him back to the precinct for minor traffic violations committed in the officers' presence, rather than issue a ticket or summons on site, such an arrest is reasonable under the Fourth Amendment.  *See Atwater*, 532 U.S. at 354 (upholding the constitutionality of a warrantless arrest for a seatbelt violation); *Whren v. United States*, 517 U.S. 806, 815 (1996) (rejecting the argument that the constitutionality of the search and seizure hinged on adherence to police regulations and standard practices); *Scopo*, 19 F.3d at 782 (arrest for minor offense of changing lanes without signaling, even if not a part of the officer's usual duties, was constitutional); *United States v. White*, 298 F. Supp. 3d 451, 458 (E.D.N.Y. 2018) (upholding the reasonableness of an arrest, which involved a search, because the officers had probable cause to arrest the defendant for a traffic violation).  Even if, as Defendant speculates, the officers had some sort of ulterior motive when arresting Defendant for the various traffic violations, suppression is not warranted because the officers' actual motivation is "irrelevant." *United States v. Lucas*, No. 19-3937-cr, 2021 WL 3700944, at *1, n.1 (2d Cir. Aug. 20, 2021) (concluding that the argument that tinted windows were not the actual reason that the police stopped a defendant is "irrelevant" to whether there was probable cause because the Fourth

Amendment analysis "does not depend on the 'actual motivations of the individual officers involved'") (quoting *Whren*, 517 U.S. at 813).

The Government's reliance on *United States v. Bignon* is also persuasive.  There, the officers observed the defendant smoking marijuana, and rather than issue him a summons, the officers decided to arrest the defendant and take him back to the precinct.  No. 18-cr-00783 (JMF), 2019 WL 643177, at *2 (S.D.N.Y. Feb. 15, 2019), *aff'd*, 813 F. App'x 34 (2d Cir. 2020). As in the present case, the officers "repeatedly assured [the defendant] that they were going to give him a ticket and release him."  *Id.*  At the station, the officers conducted an inventory search of the defendant's backpack, and found a firearm, magazine, and bullets.  *Id.*  Finding that the inventory search at the station was appropriate, the court did not suppress the firearm and other evidence seized during that search.  *Id.* at *5. The court rejected the defendant's argument that the search was unconstitutional because it was the NYPD's policy not to make arrests for marijuana possession, noting that "even assuming arguendo that [the] arrest was a violation of NYPD policy, it does not follow that the search of his backpack was a violation of the Fourth Amendment."  *Id.* at *6.  Just as here, regardless of whether the arrest was consistent with state policy, "[b]ecause [Defendant's] arrest was supported by probable cause, . . . the search was proper under the inventory search exception and thus consistent with the Fourth Amendment." *Id.*[5]

---

[5] Defendant's argument that he was unreasonably detained overnight because the patrol guide provides that individuals brought to command for identification should be "served a summons and immediately released" is also misplaced.  Br. at 10.  Defendant was held overnight because of the discovery of the illegal firearm and ammunition.

### III.    Inventory Search

Finally, it was reasonable to conduct an inventory search of the car following Defendant's lawful arrest.  Defendant does not dispute the general process of conducting inventory searches of vehicles brought to the precinct.  Indeed, it is well established that when the police "take a vehicle into custody, they may search the vehicle and make an inventory of its contents without the need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct."  *United States v. Williams*, 930 F.3d 44, 53 (2d Cir. 2019) (quoting *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008)).  As in *Bignon*, "[b]ecause [Defendant's] arrest was supported by probable cause, the search of his [vehicle] was conducted in accordance with standardized criteria or established routine, and there is no evidence that [the officers] acted in bad faith, the search was proper under the inventory search exception and thus consistent with the Fourth Amendment."  2019 WL 643177, at *6.  Thus, there is no basis to suppress the evidence of the gun and ammunition obtained during the inventory search of Defendant's vehicle.

## CONCLUSION

For all of these reasons, Defendant's motion to suppress is DENIED.

Dated:  October 5, 2023
         New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge